*810
 
 Opinion
 

 DAVIS, J.
 

 I. Introduction
 

 The central issues posed by this appeal are whether plaintiff Tahoe Regional Planning Agency (TRPA) may compel the removal of defendants’ off-premise billboard signs pursuant to its sign ordinance which allows a five-year preremoval amortization period to recoup costs or whether it is (1) statutorily compelled to pay compensation for their removal under the federal Highway Beautification Act (HBA) (23 U.S.C. § 131), or (2) constitutionally compelled to pay just compensation for a taking of defendants’ property under the just compensation clause of the Fifth Amendment of the United States Constitution.
 

 Defendants are billboard owners and lessees and owners of the real property on which the three billboards which do not comply with TRPA’s sign ordinance are located. TRPA filed suit for declaratory and injunctive relief, alleging that the billboards are prohibited off-premise signs which are fully amortized and in violation of its sign ordinance. This case comes to us on TRPA’s appeal from a judgment following the granting of defendants’ motion for summary judgment, denying TRPA’s motion for summary judgment and declaring a portion of its sign ordinance invalid.
 

 TRPA challenges the trial court’s determination that the HBA limits its authority to regulate outdoor advertising in the Lake Tahoe Region, (Region) and that its ordinance effectuates a “taking” without compensation of off-premise outdoor advertising billboards in violation of the Fifth Amendment. Defendants also urge that TRPA’s ordinance violates the free speech clause of the First Amendment. We reverse. We hold that the HBA does not limit TRPA’s authority to compel the removal of nonconforming signs within the Region pursuant to its ordinance and that the ordinance on its face does not effectuate a “taking.” Accordingly, we reverse the judgment for defendants and the declaration that section 5.00 of TRPA’s ordinance is invalid and unenforceable as applied to their existing billboards. Because there are triable issues of material fact as to whether the ordinance as applied effectuates a taking of defendants’ property, summary judgment is inappropriate and we remand for trial. Finally, we hold that the First Amendment challenge to the ordinance may be averted by limiting its reach to off-premise commercial signs, in accordance with TRPA’s original intent and its current practice.
 

 
 *811
 
 A.
 
 Procedural Background
 

 On August 16, 1983, TRPA filed a complaint for declaratory and injunctive relief and for civil penalties against defendants for violation of its Ordinance No. 24, “An Ordinance Prohibiting Off-Premise Signs Within The Tahoe Region.” Defendants generally denied the allegations of the complaint and raised affirmative defenses, including challenges to the validity of the ordinance under the federal HBA and the First, Fifth, and Fourteenth Amendments to the United States Constitution.
 

 On May 18, 1987, the parties filed a joint stipulation of facts, “for the purposes of disposition of this action pursuant to cross-motions for summary judgment and any appeals therefrom . . . .” On May 29, 1987, both plaintiff and defendants filed their motions for summary judgment.
 
 [1]
 

 On August 26, 1987, the parties stipulated that the summary judgment motions be referred to Melvin Beverly as referee for a hearing and to report to the court his findings of fact and recommended order. On September 14, 1987, the referee filed his report on cross-motions for summary judgment recommending that TRPA’s motion be denied, that defendants’ motion be granted, that judgment be entered in their favor and that a judgment be entered that section 5.00 of TRPA’s sign ordinance is invalid and unenforceable as to defendants’ existing billboards.
 
 [2]
 

 On July 28, 1988, the trial court affirmed the report of the referee in its entirety. The court ruled that the provision of Section 5.00 of TRPA’s ordinance which requires removal of nonconforming signs is invalid as (1)
 
 *812
 
 not conforming to the payment of compensation provision of the Highway Act for billboards removed from sites within 660 feet of a federal highway, and (2) as purporting to authorize the taking of property without payment of just compensation in violation of the Fifth Amendment to the United States Constitution. The court suggested alternatives to TRPA of (1) amending the ordinance to provide for amortization based on the actual value of defendants’ signs and their useful life (not the original cost); (2) withdrawing the invalid regulation in its entirety; or (3) seeking for itself the power of eminent domain. The court did not rule on defendants’ First Amendment claim of unconstitutionality of the ordinance. Judgment was entered on September 12, 1988, and TRPA timely appealed.
 

 B. Stipulated Facts
 

 According to the stipulated facts, TRPA is an agency created by the Tahoe Regional Planning Compact (hereafter, the Compact) (Pub.L. No. 91-148 (Dec. 18, 1969) 83 Stat. 360; Gov. Code, §§ 66800 and 66801; Nev. Rev. Stat. 277.190 and 277.200.),
 
 [3]
 
 with jurisdiction over the Region, as defined in the Compact, including that portion of the County of El Dorado, State of California, within the Region. Pursuant to the Compact, TRPA has adopted a regional plan and implementing ordinances for orderly growth and development within the Region. On July 24,1975, TRPA adopted Ordinance No. 24, “An Ordinance Prohibiting Off-Premise Signs Within the Tahoe Region,” effective September 22, 1975.
 

 Defendants’ outdoor advertising signs do not advertise goods or services sold or made available on the premises on which the signs are located, and do not advertise products or services sold or made available by the owners of the signs. The signs are made available to “all-comers,” in a fashion similar to newspaper or broadcasting advertising. The copy of defendants’ signs changes periodically. During defendants’ use or ownership, the signs have “advertised a business or similar economic means for the production of income,” i.e., have been used for commercial rather than noncommercial messages.
 

 Many of the commercial areas of South Lake Tahoe, California and Stateline, Nevada consist of hotels, motels, casinos, restaurants and service-businesses located on the commercial zoning along, or in close proximity to, United States Highway federal and primary Route 50. All of the businesses along that route have on-premise signs advertising the occupant of, and the nature of each business conducted upon their commercial premises.
 

 
 *813
 
 Defendants, Bruce King, doing business as Bruce Outdoor Advertising, and National Advertising Company, Inc., are engaged in the outdoor advertising business in the Region. Bruce King owns or controls no outdoor advertising signs outside the Region, while National Advertising owns or controls 39,000 outdoor advertising signs nationally. The remaining defendants own the real property and are the lessors of the property on which the outdoor advertising signs are located. Edward Stearns owns the sign on his property, and leases both the land and the sign to Bruce King.
 

 The outdoor advertising business consists of placing, maintaining and selling outdoor advertising space to “all-comers” for whatever lawful message they desire to communicate. The three outdoor advertising signs at issue in this lawsuit are located within and visible from 660 feet of a federal interstate highway, United States Highway 50.
 

 Sign A was erected in June 1961 and is owned by Bruce King. It is located on land leased from and owned by Mr. and Mrs. Burke in El Dorado County. The lease was renewed in July 1986 for an additional six and one-half years.
 

 Sign B was erected in February 1974 and is owned by Edward Stearns. It is located on his property in El Dorado County. Bruce King leases the sign from him. This lease was renewed in January 1987 for an additional six and one-half years.
 

 Sign C was erected in July 1964 and is owned by National Advertising Company, Inc. It is located in El Dorado County on land leased from David Salzberg. The lease was renewed in April 1983 for an additional 23 years.
 

 Annual income to the sign owner in 1987 was $23,400 for sign A; $24,840 for sign B; and $30,000 for sign C. Annual rent to the landowner in 1987 was $1,148 for sign A; $3,768 for sign B and $5,000 for sign C.
 

 Each of the advertisers on the signs, hotel-casinos located at Stateline, Nevada, has outdoor on-premise advertising signs at its premises advertising its business.
 

 Each of the outdoor advertising signs was legally erected in full compliance with all then-applicable laws and is in full compliance with such laws except for Ordinance No. 24. Each sign, which was constructed of steel or other durable material, has a remaining useful income-producing life in excess of 25 years, if maintained and repaired.
 

 
 *814
 
 The five-year amortization provision of section 5.10 of TRPA Ordinance No. 24 relates to the original cost of constructing the signs, unless the owner of the sign can produce sufficient evidence to show the valuation is incorrect or is set aside pursuant to the ordinance.
 

 TRPA acknowledges that defendants would produce evidence that the fair market value of sign A is $78,000; of sign B is $82,800; and of sign C is $100,000.
 

 The advertising or lease income to the respective defendants from each sign has exceeded the original cost (labor and materials) of constructing the sign and its supporting members. The amortization period of the ordinance has elapsed for each of the three signs.
 

 C. The Tahoe Regional Planning Compact
 

 The Compact is an interstate agreement executed between California and Nevada and approved by Congress in 1969. It declares that the establishment of TRPA is imperative to enhance the efficiency and governmental effectiveness of the Region. The powers given to TRPA include the establishment of environmental threshold carrying capacities and the adoption and enforcement of “a regional plan and implementing ordinances which will achieve and maintain such capacities while providing opportunities for orderly growth and development consistent with such capacities.” (§ 66801, art. I, subd. (b).)
 

 TRPA is created as a separate legal entity whose governing body is comprised of a seven-member California delegation and a seven-member Nevada delegation. (§ 66801, art. Ill, subd. (a)(1) and (2).) TRPA is required to appoint an advisory planning commission, which prepares, plans and holds public hearings and reviews written recommendations and testimony presented at such hearings. (§ 66801, art. Ill, subd. (h).) The commission recommends plans or amendments to TRPA for adoption by ordinance. (§ 66801, art. V, subd. (a).) TRPA is mandated to develop the environmental threshold carrying capacities for the Region and is authorized to request the assistance of various federal agencies in developing such capacities. (§ 66801, art. V, subd. (b).) The regional plan and all of its elements, as implemented through agency ordinances, rules and regulations, should be continuously reviewed to ensure that it achieves and maintains the carrying capacities. (§ 66801, art. V, subd. (c).) The regional plan itself must include a land plan, a transportation plan, a conservation plan, and a public services and facilities plan. (§ 66801, art. V, subd. (c).) The conservation plan is “for the preservation, development, utilization, and management of the scenic and other natural resources within the basin, including but not limited
 
 *815
 
 to, . . . scenic corridors along transportation routes, . . (§ 66801, art. V, subd. (c)(3).)
 

 The Compact grants TRPA broad powers “to adopt all necessary ordinances, rules and regulations to effectuate the adopted regional plan.” The regulations of TRPA “shall contain standards including but not limited to . . . outdoor advertising; . . .” (§ 66801, art. VI, subd. (a).)
 
 [4]
 

 D. The Sign Ordinance
 

 TRPA’s sign ordinance was enacted to maintain the natural scenic quality of the Region and to effectuate the regional plan. (TRPA Ord. No. 24, § 1.00.) It is applicable to “all signs” which are defined as “[a]ny object, device or part thereof situated outdoors or predominantly visible from outside the building in which it is situated which is used to advertise, identify, display, or attract attention to an object, person, institution, organization, business, product, service, event, or location by any means, including words, letters, numerals, figures, designs, symbols, fixtures, colors, motion, illumination, or projected images. Signs do not include the following: (1) flags of'states, nations and civil organizations; (2) national, state, religious, fraternal, professional, and civic symbols or crests; and (3) scoreboards located on athletic fields.” (TRPA Ord. No. 24, § 3.00.) Signs are further divided between “off-premise” and “on-premise” signs. On-premise signs are those advertising or otherwise relating to “any business product or activity being conducted or produced on the lot or parcel on which the sign is located” or within and located on property within an “integrated commercial complex.”
 
 (Ibid.)
 
 “Off-premise” signs are those advertising or otherwise relating to “any business, product or activity not being conducted or produced” on the property where the sign is located except signs advertising a business or activity being conducted within and located on an integrated commercial complex, signs erected or authorized by the state or local government for the purpose of public safety or information, e.g., traffic signs, hospital directional signs, or signs indicating that the property on which the sign is located is for rent, lease or sale.
 
 (Ibid.)
 

 The basic prohibition of the ordinance is directed to off-premise signs, all of which are prohibited within the Region except for temporary political signs. (TRPA Ord. No. 24, § 4.10.) Political signs are defined as those
 
 *816
 
 “advertising a candidate for public office, proposition, or other issue to be voted on by the electorate.” (TRPA Ord. No. 24, § 3.00.) These signs are allowed only in the 21-day period prior to the election and must be removed 7 days after the election unless they relate to a primary election occurring within 60 days of a general election. In this limited situation, the successful primary candidate may keep the sign in place until seven days after the general election. (TRPA Ord. No. 24, § 9.00.)
 

 The ordinance also prohibits attaching signs to trees or natural vegetation and limits the height of permitted signs. (TRPA Ord. No. 24, §§ 4.20, 4.30.)
 

 A maximum five-year amortization period is provided for signs which are or which become nonconforming. (TRPA Ord. No. 24, § 5.10.) The value of the signs is to be based upon their original cost. (TRPA Ord. No. 24, § 5.60.) All signs in violation of the ordinance are declared public nuisances. (TRPA Ord. No. 24, § 7.20.) Limited variances are allowed only when TRPA expressly finds that the sign is necessary to provide directions to a business, location or commodity advertised; the business location or commodity will be deprived of privileges enjoyed by similarly situated businesses, locations or commodities without the sign; the variance will not be contrary to the public interest; and it will not nullify the objectives of the ordinance. (TRPA Ord. No. 24, § 8.00.)
 

 II
 

 The Federal Highway Beautification Act Does Not Limit TRPA’s Power to Compel the Removal of Signs Pursuant to Its Ordinance
 

 Finding that outdoor advertising signs in areas adjacent to the Federal Interstate System and the primary system “should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty,” the federal HBA (23 U.S.C. § 131) requires that any state receiving federal aid highway funds take “effective control of the erection and maintenance . . . of outdoor advertising signs, displays and devices” which are within 660 feet of the edge of the right-of-way and visible from the system. (23 U.S.C. § 131(a), (b).)
 
 [5]
 
 A state which fails to make provisions for “effective control”
 
 *817
 
 shall have its federal aid highway funds reduced by amounts equal to 10 percent of its total allotment until it provides for this control. (23 U.S.C. § 131(b).) The key provisions of the HBA provide for the removal of any nonconforming sign, display or device within a five-year period after it becomes nonconforming. (23 U.S.C. § 131(c).) “Just compensation shall be paid upon the removal of any outdoor advertising sign, display, or device lawfully erected under State law and not permitted under [subdivision] (c) of this section whether or not removed pursuant to or because of this section. . . .” (23 U.S.C. § 131(g).)
 
 [6]
 
 “Subject to compliance with [subdivision] (g) . . . for the payment of just compensation, nothing in this section shall prohibit a State from establishing standards imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems than those established under this section.” (23 U.S.C. § 131(k).) The vehicle for ensuring “effective control” under the HBA in California is the Outdoor Advertising Act, Business and Professions Code, section 5200 et seq. Just compensation requirements are contained in Business and Professions Code section 5412, which provides that no advertising displays shall be removed “without payment of compensation, as defined in the Eminent Domain Law. . . .”
 

 Despite their similar objectives, the HBA and the Compact are in clear conflict over the method permissible to achieve their mutually held goals of “preservation of natural beauty” (23 U.S.C. § 131(a)), “scenic beauty” and “environmental and recreational values.” (§ 66801, art. I, subd. (a)(9) and (10).) Whereas the HBA provides strong incentives for states which do not wish to forfeit 10 percent of their highway funds to pay compensation as a prerequisite to removing signs, TRPA is specifically authorized to utilize its police powers to implement the regional plan through agency ordinances, including standards for “outdoor advertising.” (§ 66801, art. VI, subd. (a).) Ordinance No. 24 effectuates this plan by providing for the amortization of nonconforming signs over a five-year period. It does not provide for the payment of compensation.
 

 The trial court held that, because both the Compact and the HBA provide the power to regulate, including to prohibit, outdoor advertising, their provisions were “not so repugnant... to compel a conclusion that the latter is repealed by the former.” “However, the Highway Act goes further and requires, in the case of the removal of signs within 660 feet of a federal highway, payment of just compensation for removal of the sign.” The court
 
 *818
 
 concluded that “[t]hus, the Highway Act imposes a limitation upon the power of TRPA to compel the removal of signs—compensation must be paid. Since TRPA does not have the power of eminent domain, it does not have the power to order billboards removed.”
 

 TRPA concedes that the HBA, and, by implication, the Outdoor Advertising Act, would ordinarily circumscribe a municipality’s ability to remove nonconforming billboards without payment of compensation. It argues that the court’s ruling strips it of its power to fulfill its mandate. The Compact is a congressional enactment passed after the HBA and is more specific than the HBA due to its focus on an environmentally unique geographical area. For these reasons, TRPA contends that it “was intended to protect its scenic qualities through constitutional land-use regulations, not payment of just compensation.” This, it asserts, is the only interpretation which allows both the Compact and the HBA to function effectively. Defendants contend that the two federal enactments do not conflict but can be harmonized—by allowing TRPA the power to regulate outdoor advertising within the parameters of the HBA, including its minimum requirement that compensation be paid. In the alternative, if the Compact is inconsistent with the HBA, the HBA is the latter enactment and must prevail.
 

 A.
 
 Legal Status of Compact and TRPA Ordinance
 

 We begin with a discussion of the legal status of the Compact and of the regulations and ordinances passed by TRPA pursuant to its powers under the Compact. A common assumption underlies the positions of the parties and the trial court—that the sign ordinance, enacted pursuant to tide powers granted under the Compact, is a federal law which is to be tested against another federal law, the HBA. The legal predicate for that assumption, however, is not clear. Whether TRPA’s sign ordinance is the equivalent of a federal law or akin to a state regulation dictates our analysis. If the ordinance is viewed as akin to a state regulation, a preemption analysis is mandated. If, on the other hand, it is the equivalent of a federal law, the analytical approach suggested by the parties is appropriate. We conclude that, although TRPA’s power to enact the ordinance is derived from the federally approved Compact, the ordinance itself is more nearly akin to a state regulation and the appropriate question is whether the ordinance is preempted by the HBA.
 

 The compact clause of the United States Constitution, article I, section 10, clause 3, provides that “No State shall, without the consent of Congress . . . enter into any agreement or compact with another state . . . .” “[C]ongressional consent transforms an interstate compact within [the Compact] Clause into a law of the United States . . . .”
 
 (Cuyler
 
 v.
 
 Adams
 
 
 *819
 
 (1981) 449 U.S. 433, 438 [66 L.Ed.2d 641, 648, 101 S.Ct. 703, 706].) It is undeniable that the Compact itself was transformed into a law of the United States when it was approved by Congress pursuant to article I, section 10, clause 3 of the United States Constitution. (See
 
 League to Save Lake Tahoe
 
 v.
 
 Tahoe Reg. Plan Agcy.
 
 (9th Cir. 1974) 507 F.2d 517, cert. den. (1975) 420 U.S. 974 [43 L.Ed.2d 654, 95 S.Ct. 1398];
 
 California Tahoe Regional Planning Agcy.
 
 v.
 
 Jennings
 
 (9th Cir. 1979) 594 F.2d 181, 190, cert, den. (1979) 444 U.S. 864 [62 L.E.2d 86, 100 S.Ct. 133];
 
 Jacobson
 
 v.
 
 Tahoe Regional Planning Agcy. (TRPA)
 
 (9th Cir. 1977) 566 F.2d 1353, 1358, affd. in part and revd. in part (1979) 440 U.S. 391 [59 L.Ed.2d 401, 99 S.Ct. 1171].)
 

 The congressionally approved, bistate compact has been described as a “centaur of legislation.”
 
 (Jacobson
 
 v.
 
 TRPA, supra,
 
 566 F.2d at p. 1359, fn. 8.) That this characterization is apt can be seen from its blending of seemingly contradictory attributes. Although the Compact is a federal law, the actions of TRPA and its state officials have been held to be “under color of state law” within the meaning of 42 United States Code section 1983.
 
 (Lake Country Estates
 
 v.
 
 Tahoe Planning Agcy.
 
 (1979) 440 U.S. 391, 399 [59 L.Ed.2d 401, 410, 99 S.Ct. 1171].)
 
 [7]
 
 Congressional consent did not transform TRPA into a “federal agency”
 
 (People, etc.
 
 v.
 
 City of South Lake Tahoe
 
 (E.D.Cal. 1978) 466 F.Supp. 527) nor did Congress make the entire panoply of federal administrative and substantive standards applicable to the Compact.
 
 (California Tahoe Regional Planning Agcy.
 
 v.
 
 Jennings, supra,
 
 594 F.2d at p. 358, fn. 7.)
 

 Regulations and ordinances enacted by TRPA pursuant to its powers under the Compact do not automatically acquire the status of federal law. The criteria to be used in determining whether a TRPA ordinance constitutes federal law has been discussed in the context of determining federal question jurisdiction. The “threshold inquiry [is] whether the Ordinance is a Taw of the United States’ within the meaning of 28 U.S.C. § 1331(a).”
 
 [8]
 

 (League to Save Lake Tahoe
 
 v.
 
 B.J.K. Corp.
 
 (1976) 547 F.2d 1072, p. 1074, fn. 3.) In
 
 B.J.K. Corp.,
 
 the court emphasized that “[questions arising under the TRPA Land Use Ordinance enacted pursuant to the Compact do not automatically
 
 *820
 
 give rise to Section 1331(a) jurisdiction, because the Compact is not an ordinary federal statute and the Ordinance is not directly analogous to the Code of Federal Regulations. . . . [¶] By permitting a state-initiated response to regional matters, Congress has done something quite different from incorporating a state law into a federal statute or from enacting a federal regulatory statute.”
 
 (Id.
 
 at p. 1073.)
 

 Because federal question jurisdiction is available only when the claim “arises under” federal law, the status of the ordinance was resolved by determining whether it was “basic” and “necessary” to the Compact rather than simply “collateral” or “merely possible.” (547 F.2d at p. 1074.) Pragmatic considerations relevant in deciding when construction of a TRPA Ordinance itself presents a federal question are whether interstate conflicts in the interpretation and application of the ordinance may arise that may substantially affect the effective functioning of the Compact and whether, absent a federal trial forum, existing judicial mechanisms supply a practical means for resolving such conflicts. Due to the historic dispute between California and Nevada over the extent of desired development, the court found that conflicting interpretations of the ordinance would be “inevitable” if exclusive jurisdiction to interpret and apply the ordinance rested with the state courts of California and Nevada. Accordingly, the court held that a suit arising under TRPA’s Land Use Ordinance (Land Use Ord., § 9.11) raised a federal question which permitted plaintiff to invoke federal question jurisdiction. In a cautionary note, the court indicated that not every interpretation or application of an ordinance would generate conflict that might impair the effective administration of the regional plan. A different result may be reached if the interpretation and application of TRPA ordinances “have little or no impact on the regional plan.” (547 F.2d at p. 1075.)
 
 [9]
 

 Our analysis of the Compact leads us to conclude that, in an appropriate case, the sign ordinance may be considered as “arising under the . . . laws of the United States” within the meaning of 28 United States Code section 1331 for the purpose of establishing federal question jurisdiction. The ordinance regulates an area which is without question both basic and necessary to achieving the purposes of the Compact. This conclusion, however, does not mean that TRPA’s ordinance is tantamount to a “federal law” for all purposes.
 

 “Since the first version of [section] 1331 was enacted, ... the statutory phrase ‘arising under the Constitution, laws, or treaties of the
 
 *821
 
 United States’ has resisted all attempts to frame a single, precise definition for determining which cases fall within, and which cases fall outside, the original jurisdiction of the district courts .... [T]he phrase ‘arising under’ masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system.”
 
 (Franchise Tax Bd.
 
 v.
 
 Laborers Vacation Trust
 
 (1983) 463 U.S. 1, 8 [77 L.Ed.2d 420, 430, 103 S.Ct. 2841].) The application of federal question jurisdiction under this standard is much broader than a simple determination of whether the jurisdictional subject is in fact a “federal law.” For example, even though state law creates plaintiff’s cause of action, the case “might still ‘arise under’ the laws of the United States if a well-pleaded complaint[
 
 10
 
 ] established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties.” (463 U.S. at p. 13 [77 L.Ed.2d at p. 433];
 
 Ivy Broadcasting Co.
 
 v.
 
 American Tel. & Tel. Co.
 
 (2d Cir. 1968) 391 F.2d 486, 492.) Whether a case “arises under” a federal law is entirely separate and distinct from whether the complaint states a claim upon which relief can be granted and whether there is any merit to the claim.
 
 (Div. 1287, etc.
 
 v.
 
 Kansas City Area Transp. Auth.
 
 (8th Cir. 1978) 582 F.2d 444, 449.)
 

 Here, the concerns which fueled the
 
 B.J.K. Corp.
 
 court’s conclusion that the TRPA ordinance before it raised a federal question are absent. The issue is not the need for an unbiased forum or consistent interpretation and application of the Compact through its ordinance. Rather, the issue is determining the relationship of the ordinance to the HBA, a federal statute. This determination does not in itself raise a federal question under 28 United States Code section 1331.
 
 [11]
 
 The existence of a federal preemption defense, such as the HBA defense presented here, does not automatically confer federal question jurisdiction, either directly or by removal. This established rule remains unchanged even where the parties admit that the defense is the only question truly at issue.
 
 (Franchise Tax Bd.
 
 v.
 
 Laborers Vacation Trust, supra,
 
 463 U.S. at p. 14 [77 L.Ed.2d at pp. 433-434].) Under these circumstances, the ordinance is more aptly viewed as a child of “an agency of the contracting states, . . . operating] under the aegis of federal law.”
 
 (Jacobson
 
 v.
 
 TRPA, supra,
 
 566 F.2d at p. 1358.) The appropriate question is whether the ordinance is preempted by the just compensation provision of the HBA. We hold that it is not. We further conclude that the compensation provisions of the HBA do not create enforceable rights by billboard owners seeking compensation.
 

 
 *822
 

 B. Preemption
 

 The supremacy clause of article VI of the Constitution provides Congress with the power to preempt state law. “The circumstances in which federal law pre-empts state regulation are familiar. [Citations.] A pre-emption question requires an examination of congressional intent. [Citations.] Of course, Congress explicitly may define the extent to which its enactments preempt state law. [Citations.] In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where ‘the object sought to be obtained by the federal law and the character of obligations imposed by it. . . reveal the same purpose.’
 
 (Rice
 
 v.
 
 Santa Fe Elevator Corp.,
 
 331 U.S. 218, 230, [91 L.Ed. 1447, 67 S.Ct. 1146] (1947).) Finally, even where Congress has not entirely displaced State regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found ‘ “when it is impossible to comply with both state and federal law,
 
 Florida Lime & Avocado Growers, Inc.
 
 v.
 
 Pau,
 
 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 83 S.Ct. 1210] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress,
 
 Hines
 
 v.
 
 Davidowitz,
 
 312 U.S. 52, 67 (1941) [85 L.Ed. 581, 61 S.Ct. 399].” ’ ”
 
 (Schneidewind
 
 v.
 
 ANR Pipeline Co.
 
 (1988) 485 U.S. 293, 299-300 [99 L.Ed.2d 316, 325, 108 S.Ct. 1145], quoting
 
 California Coastal Comm’n
 
 v.
 
 Granite Rock Co.
 
 (1987) 480 U.S. 572, 581, [94 L.Ed.2d 577, 591-592, 107 S.Ct. 1419].)
 

 The provisions of the HBA, including its just compensation clause, are not mandatory and have been held not to preempt conflicting state statutes. In
 
 Markham Advertising Company
 
 v.
 
 State [Washington]
 
 (1968) 73 Wn.2d 405 [439 P.2d 248], dismissed for want of a substantial federal question (1969) 393 U.S. 316 [21 L.Ed.2d 512, 89 S.Ct. 553], rehearing denied (1969) 393 U.S. 1112 [21 L.Ed.2d 813, 89 S.Ct. 854], advertisers claimed that the state’s outdoor advertising statutes, which declared nonconforming signs a nuisance and did not provide for compensation, were preempted by the HBA under the supremacy clause. The Washington Supreme Court held that the HBA did not preempt the field, and that the states were free to regulate outdoor advertising within their borders. Reviewing the statute as a whole for an indication of congressional intent, the court stated that “[o]ur examination of [section] 131,
 
 supra,
 
 leads us to conclude that its essential operation is to condition payment of 10 percent of a state’s share of federal-aid highway funds upon the state’s exercise of its powers to regulate outdoor advertising in a manner consistent with federal standards. We think that the purpose of the federal statute is obviously to induce the states to act,
 
 *823
 
 not to require them to do so. The statute allows the state to choose between foregoing 10 per cent of its allotment of federal-aid highway funds and compliance. If Congress had intended the provisions of 23 U.S.C., [section] 131 (Supp.II, 1967) to be mandatory on the states, there would have been no need to attach a monetary penalty to noncompliance. [Citation.] We hold that Congress has not invoked the Supremacy Clause by preempting the field of regulation covered by the state Act; that [the Act] ... is directory . . . .” (439 P.2d at p. 257.)
 
 [12]
 

 In addition, we conclude that Congress necessarily created a narrow exception to the HBA within the limited geographical area of the Tahoe Basin when it approved the Compact in 1980. In
 
 City of South Lake Tahoe
 
 v.
 
 Tahoe Reg. Plan. Agcy.
 
 (E.D.Cal. 1987) 664 F.Supp. 1375, the district court rejected a similar preemption argument. There, it was contended that TRPA’s power to enforce its limit on the number of flights into a local airport pursuant to its cease-and-desist order was preempted by the federal Airline Deregulation Act of 1978 (ADA), 49 United States Code section 1301. The ADA’s preemption clause, which prohibited states and interstate agencies from airline regulation, was held not to affect TRPA’s powers. Because the Compact was approved in 1980, two years after the passage of the ADA, “Congress, while generally desirous of an open sky policy, must have realized that the enactment of the Tahoe Regional Planning Compact... in December of 1980, after enactment of the Airline Deregulation Act of 1978, . . . would effectively require some incidental regulation of airlines into the Tahoe Basin.” (664 F.Supp. at pp. 1376-1377.) As a result, the court concluded “that the Congress necessarily created, for environmental reasons, a narrow geographical exception to the open sky policy embodied, in part, by the Airline Deregulation Act. . . .”
 
 (Id.
 
 at p. 1377.) The ADA’s preemption clause was held not to affect TRPA which derived its “broad environmental regulatory powers” from a federally approved compact. Finally, the court reasoned that even though the Compact and the ADA overlap, they do so only in the Tahoe Basin. As a result, “[b]ecause the ADA is general and National in scope and the Compact is specific and limited to a narrow geographic location, the two federal schemes can operate concurrently without harming the effectiveness of each other.”
 
 (Ibid.)
 

 Similarly, when it approved the expanded Compact in 1980, two years after the amendment of the HBA, Congress must have realized that its
 
 *824
 
 effective implementation would require the removal of nonconforming outdoor advertising signs pursuant to its police powers, because TRPA has no powers of eminent domain.
 
 [13]
 
 TRPA’s sign ordinance was enacted in 1975. As approved, the 1980 Compact provides that existing California-TRPA and TRPA ordinances shall continue to be applicable. (Compact, art. V, subd. (e).) Such congressional consent to legislation which is not formally part of the Compact has been characterized as “of great significance” in denying a preemption claim.
 
 [14]
 

 The effect of congressional approval of the Compact in indicating its intention not to preempt within the Region has been recognized by the federal courts. As noted by the district court in
 
 State of Cal.
 
 v.
 
 Tahoe Regional Planning Agency
 
 (E.D.Cal. 1986) 664 F.Supp. 1373, even “[assuming that this [statutory] language preempts and precludes state jurisdiction to prevent navigational hazards, [intervenor] . . . completely ignores the role of Congress in approving the Tahoe Compact which establishes the jurisdiction of TRPA.”
 
 (Id.
 
 at p. 1375.) The court held that TRPA’s shore zone ordinance, which tried to assure that shore zone projects would not pose hazards to navigation, was not preempted by 33 United States Code sections 401-406, which prohibit the creation of any obstruction to navigable waters not affirmatively authorized by Congress. The court also noted it had
 
 *825
 
 previously rejected similar preemption arguments in unpublished rulings in favor of TRPA.
 
 (Id.
 
 at p. 1375, fn. 3.) Fulfilling this congressional intent by recognizing a narrow exception to the statutory compensation clause in the Region does not thwart the full accomplishment of the primary purposes of the HBA.
 

 Our conclusion is buttressed by the complete absence in this record of any indication that the Federal Highway Administration (FHWA) or the Secretary of Transportation (Secretary) have taken any action to enforce the HBA in the Tahoe Region. It is established that a decision by the FHWA and the Secretary not to undertake enforcement proceedings for a violation of the HBA’s outdoor advertising provisions is a decision committed to the discretion of the agency and is not subject to judicial review.
 
 (Sierra Club
 
 v.
 
 Larson
 
 (4th Cir. 1989) 882 F.2d 128.) The record before us does not indicate that any attempt toward enforcement of the just compensation provision of the HBA has been taken by the Secretary or the FHWA, despite the fact that the ordinance was effective September 22, 1975, and the first five-year amortization period would have expired in late 1980.
 
 [15]
 
 This absence of enforcement activity indicates a recognition by the federal agency that enforcement in the Region is not appropriate.
 

 That the Compact contains language generally preserving the powers and laws of the United States does not mandate a contrary conclusion.
 
 [16]
 
 The only case which has addressed this issue,
 
 City of South Lake Tahoe
 
 v.
 
 Tahoe Reg. Plan. Agcy., supra,
 
 664 F.Supp. 1375, 1377, held that this clause did not
 
 *826
 
 mandate preemption of a TRPA regulation by the ADA. The court stated that “[p]laintiff’s reliance on Article X, Section 5 of the Compact, to establish preemption is misplaced. That section is a general reservation clause designed to protect the jurisdiction of the Departments of the Interior and Agriculture. It was not intended to exempt the owner of the airport from the requirements of the Compact. Moreover, that clause is very similar to the reservation clause of the waterfront compact considered by the Supreme Court in
 
 DeVeau
 
 [v.
 
 Braisted,
 
 363 U.S. 144, [80 S.Ct. 1146, 4 L.Ed.2d 1109] (I960)]. The court there concluded that the clause did not defeat jurisdiction under the waterfront compact to regulate certain labor activities which were argued as being preempted by the National Labor Relations Act.” (664 F.Supp. at p. 1377.)
 
 [17]
 
 Similarly, this clause is not intended to protect billboard owners from effective implementation of the Compact.
 

 Finally, because the HBA does not mandate the statutory payment of “just compensation” but merely grants a “powerful incentive” to do so, a private cause of action for compensation cannot be implied.
 
 (National Advertising Co.
 
 v.
 
 City of Ashland, Or.
 
 (9th Cir. 1982) 678 F.2d 106, 107.) As in
 
 Ashland,
 
 the HBA does not provide a remedy for advertisers seeking compensation.
 

 Our conclusion that there is a limited exception to the statutory compensation requirement within the Tahoe Region is equally applicable to California’s Outdoor Advertising Act (OAA) (Bus. & Prof. Code, § 5200 et seq.), which operates as the HBA’s vehicle within the state. Describing the relationship between the OAA and the HBA, the California Supreme Court has
 
 *827
 
 stated that “California complies with the Highway Beautification Act through its Outdoor Advertising Act . . . [which] provides for restrictions upon outdoor advertising consonant with the provisions of the Highway Beautification Act.”
 
 (People
 
 ex rel.
 
 Dept. of Transportation
 
 v.
 
 Naegele Outdoor Advertising Co.
 
 (1985) 38 Cal.3d 509, 516 [213 Cal.Rptr. 247, 698 P.2d 150].) The compensation provisions of the OAA are “required by the federal Highway Beautification Act. . . .”
 
 (City of Salinas
 
 v.
 
 Ryan Outdoor Advertising, Inc.
 
 (1987) 189 Cal.App.3d 416, 425 [234 Cal.Rptr. 619].) Moreover, the exclusion of signs within the jurisdiction of the HBA from the OAA’s compensation exceptions indicates an intent that the OAA not be applied in any manner which conflicts with the HBA. (Bus. & Prof. Code, §§ 5412.1, subd. (c), 5412.2, subd. (c), 5412.3, subd. (c).)
 

 For the first time on petition for rehearing, defendants argue that the OAA does not merely implement the compensation requirement for billboards under the jurisdiction of the HBA, but is an independent ground for striking down the TRPA ordinance. We conclude that the compensation requirement of the OAA cannot be enforced within the Region in derogation of the TRPA ordinance.
 

 Where a compact organization has acted within the parameters of its jurisdiction, “[a] state can impose state law on [that] organization only if the compact specifically reserves its right to do so.”
 
 (Seattle Master Builders
 
 v.
 
 Pacific N.W. Elec. Power
 
 (9th Cir. 1986) 786 F.2d 1359, 1371 [state environmental laws inapplicable to compact agency where neither Washington nor Montana reserved such rights].) Whether a state law is applicable to TRPA generally requires consideration of “whether . . . [such] application . . . would be consistent with the Compact.”
 
 (People, etc.
 
 v.
 
 City of South Lake Tahoe, supra,
 
 466 F.Supp. 527, 536.) Although no definitive test has been established, a two-step analysis can be gleaned from cases discussing this issue. First, the Compact is examined to determine whether it explicitly reserved to the states the right to impose their requirements on the bistate agency.
 
 (Cal. Tahoe Regional Planning
 
 v.
 
 Sahara Tahoe Corp., supra,
 
 504 F.Supp. 753, 760.) Even where the Compact mentions particular types of laws, if it is not explicit regarding the means states might use to implement them, TRPA will not be bound by a state law which may result in the unilateral invalidation of a TRPA action.
 
 (Ibid.
 
 [California’s Political Reform Act held inapplicable to TRPA despite provision of Compact allowing each state to provide by law for the disclosure or elimination of conflicts of interest of its members].) Second, if there is no direct reference to a particular state law in the Compact, it may nonetheless be applicable under the “equal or higher requirement” provision of article VI, subd. (a) of the Compact.
 
 (People, etc.
 
 v.
 
 City of South Lake Tahoe, supra,
 
 466 F.Supp. at pp. 536-538 [California Environmental Quality Act’s (CEQA) higher
 
 *828
 
 environmental disclosure standards held applicable to TRPA projects in California portion of Tahoe basin]; accord,
 
 Cal. Tahoe Regional Planning
 
 v.
 
 Harrah’s Corp., supra,
 
 509 F. Supp. 753, 759-760.)
 

 Because the OAA is not one of the state laws enumerated in the Compact,
 
 [18]
 
 it can only be applicable to TRPA if it falls within the meaning of section 66801, article VI, subdivision (a). That article provides that “[e]xcept as otherwise provided . . . , every such ordinance, rule or regulation shall establish a minimum standard applicable throughout the region. Any political subdivision or public agency may adopt and enforce an equal or higher requirement applicable to the same subject of regulation in its territory. . . .” (Gov. Code, § 66801, art. VI, subd. (a).)
 

 The “equal or higher” requirement provision of section 66801, article VI, subd. (a) is not synonymous with any additional requirement of state law relating to the same subject, such as the compensation provision at issue here. Rather, “Article VI(a) of the Compact only authorizes political subdivisions to adopt more stringent
 
 environmental
 
 standards than those of the TRPA with respect to areas within the subdivision.”
 
 (Cal. Tahoe Regional Planning
 
 v.
 
 Sahara Tahoe, supra,
 
 504 F.Supp. at p. 764, italics added.) Limiting the interpretation of article VI, subd. (a) to equal or higher environmental standards is consonant with “the primary purpose of TRPA, . . . [which] is to protect the environment.”
 
 (People, etc.
 
 v.
 
 City of South Lake Tahoe, supra,
 
 466 F.Supp. at p. 539.) Additional nonenvironmental standards which effectively thwart that purpose cannot be considered equal or higher requirements under the Compact. Unlike the disclosure provisions of CEQA which provide additional environmental information but cannot overrule TRPA, the OAA’s compensation requirement has no relation to environmental standards but would burden the Compact and overrule TRPA’s implementation of its ordinance within the Region. Accordingly, this particular requirement of the OAA cannot be enforced in the Region in derogation of the TRPA sign ordinance.
 

 
 *829
 
 III
 

 Section 5.00 of TRPA’s Ordinance Is Not Invalid as Purporting to Authorize a Taking of Property Without Payment of Just Compensation in Violation of the Fifth Amendment
 

 The Fifth Amendment guarantees that private property shall not “be taken for public use without just compensation.” Although not all regulatory invasions of property rights amount to takings, constraints imposed upon property may be “so onerous as to constitute a taking which constitutionally requires compensation.”
 
 (Goldblatt
 
 v.
 
 Town of Hempstead
 
 (1962) 369 U.S. 590, 594, [8 L.Ed.2d 130, 133, 82 S.Ct. 987].) A land-use regulation can effect a “taking” which requires compensation under the Fifth Amendment if it “ ‘does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land.’ ”
 
 (Keystone Bituminous Coal Assn.
 
 v.
 
 DeBenedictis
 
 (1987) 480 U.S. 470, 485, [94 L.Ed.2d 472, 488, 107 S.Ct. 1232, 1242, ], quoting
 
 Agins
 
 v.
 
 Tiburon
 
 (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 111-112, 100 S.Ct. 2138, 2141].)
 

 Under established California law, an ordinance prohibiting existing billboards may be enforced as a constitutionally valid exercise of the state’s police power which does not require compensation if a reasonable amortization period for discontinuance of the use is provided.
 
 (Castner
 
 v.
 
 City of Oakland
 
 (1982) 129 Cal.App.3d 94, 96 [180 Cal.Rptr. 682];
 
 National Advertising Co.
 
 v.
 
 County of Monterey
 
 (1970) 1 Cal.3d 875, 878 [83 Cal.Rptr. 577, 464 P.2d 33];
 
 Livingston Rock etc. Co.
 
 v.
 
 County of L. A.
 
 (1954) 43 Cal.2d 121, 127 [272 P.2d 4];
 
 City of Los Angeles
 
 v.
 
 Gage
 
 (1954) 127 Cal.App.2d 442, 460 [274 P.2d 34].) “Simply stated, an amortization provision provides a period of time in which a new land use ordinance will not be enforced, during which time a property user either can make a use conform to the ordinance, or, if a user cannot or chooses not to conform, during which a user can recover all or a part of his investment before the use must be discontinued.”
 
 (Georgia Outdoor Advertising
 
 v.
 
 City of Waynesville
 
 (4th Cir. 1990) 900 F.2d 783, 785.) The question before us is whether the United States Supreme Court’s decisions in
 
 First Lutheran Church
 
 v.
 
 Los Angeles County
 
 (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct.2378] (hereafter
 
 First English )
 
 and
 
 Nollan
 
 v.
 
 California Coastal Comm’n
 
 (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (hereafter Nollan) changed this law to preclude the use of amortization under the state’s police power and, in its stead, mandated the payment of just compensation for the removal of billboards in all cases. We conclude that they did not.
 

 The trial court recognized this established law but concluded that
 
 First English
 
 is an obstacle to TRPA’s efforts to remove the billboards due to its
 
 *830
 
 holding that a property owner is entitled to just compensation under the Fifth Amendment where a regulation takes all use of the property. While the court did not expressly rule that amortization was no longer permissible, it found that “the outright use of the signs where now located is forbidden” under TRPA’s ordinance; that the sign owner “has only the right to remove the sign to some location where it is not prohibited (which would be outside of the Lake Tahoe Basin)”; and that “the property owner is left only with bare land no longer producing any income.” The court held that, under
 
 First English,
 
 “the effect of the TRPA ordinance on defendants’ signs amounts to a taking, leaving defendants only a minor vestige of use.”
 

 In addition, the court found that, because the sign ordinance is not a health or safety regulation, it is entitled to less deference under
 
 Nollan,
 
 which “indicates that purely aesthetic values will no longer enjoy the deference previously given them.” It based this conclusion on a finding that TRPA is not charged or empowered to make public health and safety regulations and that it “is limited to purely aesthetic type regulations designed to preserve scenic beauty and to preserve environmental and recreational values.”
 

 The trial court did not address the issue of whether TRPA should be required to pay compensation. Instead, it found section 5.00 of the ordinance, which requires removal of nonconforming signs following a five-year amortization period, to be invalid “as purporting to authorize the taking of property without the payment of just compensation in violation of the Fifth Amendment.”
 

 As discussed below, we hold that
 
 First English
 
 did not rule out the historic use of legitimate land-use regulations for the removal of billboards after a reasonable amortization period. Accordingly, the trial court erred in determining that Section 5.00 of TRPA’s sign ordinance effectuates a “taking” on this basis. We also conclude that
 
 Nollan
 
 did not erode aesthetics or scenic zoning as a legitimate focus of such regulation and that TRPA’s ordinance advances a legitimate interest in maintaining the “natural scenic quality of the Region.” (TRPA Ord. No. 24, § 1.00.) Whether a taking has occurred in this particular case must await resolution on a full factual record. Because there remain triable issues of material fact as to whether the ordinance denies defendants economically viable use of their property, summary judgment is inappropriate and the case must be remanded for further proceedings.
 

 A.
 
 Amortization Is an Appropriate Method for the Elimination of Nonconforming Uses
 

 California cases have established that nonconforming uses may be eliminated by one of two “constitutionally equivalent alternatives: It can
 
 *831
 
 eliminate the use immediately by payment of just compensation, or it can require removal of the use without compensation following a reasonable amortization period.”
 
 (Metromedia, Inc.
 
 v.
 
 City of San Diego
 
 (1980) 26 Cal.3d 848, 881 [164 Cal.Rptr. 510, 610 P.2d 407], rev. on other grounds
 
 Metromedia, Inc.
 
 v.
 
 San Diego
 
 (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882].) In
 
 Livingston Rock etc. Co.
 
 v.
 
 County of L. A., supra,
 
 43 Cal.2d at page 127, the court set forth the analytical foundation for the approval of compelled elimination of nonconforming uses within specified periods as follows: “Implicit in the theory of the police power as differentiated from the power of eminent domain, is the principle that incidental injury to an individual will not prevent its operation, once it is shown to be exercised for proper purposes of public health, safety, morals, and general welfare, and there is no arbitrary and unreasonable application in the particular case.”
 

 The reasonable regulation of signs and billboards constitutes a valid exercise of police power.
 
 (United Business Com.
 
 v.
 
 City of San Diego
 
 (1979) 91 Cal.App.3d 156, 164 [154 Cal.Rptr. 263];
 
 Carlin
 
 v.
 
 City of Palm Springs
 
 (1971) 14 Cal.App.3d 706, 712 [92 Cal.Rptr. 535];
 
 National Advertising Co.
 
 v.
 
 County of Monterey, supra,
 
 1 Cal.3d 875, cert. den. (1970) 398 U.S. 946 [26 L.Ed.2d 286, 90 S.Ct. 1869].) Because the values embedded in the concept of public welfare are “ ‘. . . spiritual as well as physical, aesthetic as well as monetary,’ ” “[i]t is well settled that the state may legitimately exercise its police powers to advance aesthetic values.”
 
 (City Council
 
 v.
 
 Taxpayers for Vincent
 
 (1984) 466 U.S. 789, 805 [80 L.Ed.2d 772, 787, 104 S.Ct. 2118], quoting
 
 Berman
 
 v.
 
 Parker
 
 (1954) 348 U.S. 26, 32-33 [99 L.Ed. 27, 75, S.Ct. 98].) Aesthetic or scenic zoning has been recognized as a legitimate state interest and as a proper objective in itself of the police power. Because California, like TRPA, relies on its scenery “to attract tourists and commerce, aesthetic considerations assume economic value. Consequently any distinction between aesthetic and economic grounds as a justification for billboard regulation must fail.”
 
 (Metromedia, Inc., supra,
 
 26 Cal.3d at p. 861.)
 
 [19]
 

 The principle that “zoning legislation may validly provide for the eventual termination of nonconforming property uses without compensation if it provides a reasonable amortization period commensurate with the investment involved” is well established.
 
 (Castner
 
 v.
 
 City of Oakland, supra,
 
 
 *832
 
 129 Cal.App.3d at p. 96;
 
 National Advertising Co.
 
 v.
 
 County of Monterey, supra,
 
 1 Cal.3d 875;
 
 Livingston Rock etc. Co.
 
 v.
 
 County of L. A., supra,
 
 43 Cal.2d 121;
 
 City of Los Angeles
 
 v.
 
 Gage, supra,
 
 127 Cal.App.2d 442, 460.) In
 
 National Advertising Co., supra,
 
 the Supreme Court considered the validity of a county zoning ordinance which prohibited off-site billboards in an undeveloped district and which provided that nonconforming off-site signs be removed within one year of the date the property is reclassified into a different zoning district. At issue was the reasonableness of the one-year amortization period.
 

 In approving the ordinance, the court noted that zoning legislation may validly provide for the eventual discontinuance of nonconforming uses within a prescribed reasonable amortization period commensurate with the investment involved. Whether a particular amortization period prescribed by an ordinance mandating the eventual discontinuance of its use is reasonable and commensurate with the investment involved is a factual determination and the burden is on the person challenging the ordinance to show its invalidity as to their property.
 
 (National Advertising Co., supra,
 
 1 Cal.3d at p. 879.) The court held that plaintiff had not met its burden of demonstrating unreasonableness of the amortization period as to 31 of its signs which evidence indicated had already been fully amortized; however, removal of the remaining signs which were not fully amortized under rules of the Internal Revenue Service should await “a reasonable amortization period in order to permit plaintiff to recover their original cost.”
 
 (Id.,
 
 at p. 880.)
 

 In
 
 City of Salinas
 
 v.
 
 Ryan Outdoor Advertising, Inc., supra,
 
 189 Cal.App.3d 416, 423-424, the removal of off-site billboards pursuant to a city ordinance was held not to constitute a taking without just compensation. In
 
 Ryan,
 
 the court stated that “[t]he U.S. Supreme Court has made it clear that local regulations imposing restrictions on outdoor commercial advertising are a constitutionally valid means of advancing the substantial governmental interests of traffic safety and the appearance of the city.” It noted that under
 
 National Advertising Co.,
 
 “it is settled law that local zoning legislation may require termination of nonconforming uses if it provides for a reasonable amortization period, considering the investment involved.”
 
 (Ibid.)
 
 The court held that the five-year amortization period was reasonable as applied to the sign owners, who in fact had had fifteen years to recoup their investment before the issue came to trial.
 

 The central issue in cases involving the termination of nonconforming uses is the reasonableness of the amortization period allowed. The burden is on the advertiser to establish the unreasonableness of the amortization period with regard to each structure declared to be nonconforming.
 
 (Ryan, supra,
 
 189 Cal.App.3d at p. 424.) It is not required that the nonconforming property
 
 *833
 
 have no value at the termination date.
 
 (Metromedia, Inc., supra,
 
 26 Cal.3d at p. 882, citing
 
 Art Neon Co.
 
 v.
 
 City and County of Denver
 
 (10th Cir. 1973) 488 F.2d 118, 121.) Relevant factors to be considered in determining whether an amortization period is unreasonable as applied to a particular property include amount of investment or original cost, present actual or depreciated value, dates of construction, amortization for tax purposes, salvage value, “remaining useful life, the length and remaining term of the lease under which it is maintained, and the harm to the public if the structure remains standing beyond the prescribed amortization period.”
 
 (Metromedia, Inc., supra,
 
 26 Cal.3d at p. 884;
 
 United Business Com.
 
 v.
 
 City of San Diego, supra,
 
 91 Cal.App.3d at p. 181 [amortization period of seven years not unreasonable on its face].)
 

 First English, supra,
 
 did not eliminate the availability of amortization of nonconforming uses as a constitutionally valid method of implementing legitimate regulatory goals.
 

 In
 
 First English,
 
 owners challenged an interim ordinance which banned the construction or reconstruction of any buildings in a flood protection area, which included a portion of their church campground property. The ordinance was enacted after a flood inflicted substantial economic losses and destroyed the owner’s campsite buildings. The United States Supreme Court did not address whether or not a taking had occurred by virtue of the ordinance. The focus of its decision was on the remedy available once a taking has occurred; specifically, whether the just compensation clause requires the government to pay for “temporary” regulatory takings.
 

 In ruling against First English, the California Court of Appeal had applied the rule of
 
 Agins
 
 v.
 
 City of Tiburon
 
 (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affirmed on other grounds
 
 Agins
 
 v.
 
 Tiburon, supra,
 
 447 U.S. 255, in which the California Supreme Court held that a landowner may not maintain an inverse condemnation suit based upon a “regulatory” taking; rather, compensation was not required until the regulation or ordinance had been held excessive in an action for declaratory relief or in a writ of mandamus followed by governmental persistence in continuing the regulation in effect. Overruling
 
 Agins
 
 on this point, the United States Supreme Court reversed.
 

 The court specifically rejected the suggestion that it “independently evaluate the adequacy of the complaint and resolve the takings claim on the merits. . . .”
 
 [20]
 
 More importantly, it noted that it thus had no occasion to
 
 *834
 
 decide whether this particular ordinance actually denied plaintiff “all use of its property or whether the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as part of the State’s authority to enact safety regulations.” (482 U.S. at p. 313 [96 L.Ed.2d at p. 262], fn. omitted.)
 

 The remedial question posed was whether a government which abandons the enforcement of an ordinance must still pay compensation for the time period during which the regulation denied the landowner all use of its land. (482 U.S. at p. 318 [96 L.Ed.2d at pp. 265-266].) It noted that “temporary” takings which deny a landowner all use of his property are not different in kind from permanent takings which clearly require compensation.
 
 (Ibid.)
 
 Under these circumstances, mere invalidation of an ordinance is not a sufficient remedy under the just compensation clause.
 
 (Id.,
 
 at p. 319 [96 L.Ed.2d at pp. 266-267].)
 

 The court held that where the government’s activities have already worked a taking of all use of property, no subsequent action can relieve it of the duty to provide compensation during the taking period. The state may not constitutionally limit the remedy for a taking to nonmonetary relief. (482 U.S. at p. 321 [96 L.Ed.2d at pp. 267-268].) The court was careful to reiterate that it had
 
 assumed
 
 that the allegation that “all use” of the property for a considerable period of years was taken was true and it limited its holding to the facts presented.
 
 (Ibid.)
 

 On remand, in
 
 First English Evangelical Lutheran Church
 
 v.
 
 County of Los Angeles
 
 (1989) 210 Cal.App.3d 1353 [258 Cal.Rptr. 893], certiorari denied (1990) 493 U.S. 1056 [107 L.Ed 2d 950, 110 S.Ct. 866] (hereafter
 
 First English II),
 
 the issue was whether the county’s ordinance actually amounted to an unconstitutional taking of appellant’s property without compensation. The court held that the ordinance did not in fact deny
 
 First English
 
 “all uses” of its property and that whatever uses were denied were properly denied to preserve the state’s interest in public safety.
 
 [21]
 
 Accordingly, there was no temporary taking.
 

 
 *835
 
 Cases since
 
 First English
 
 have made it clear that courts must still engage in a particularized analysis of the challenged ordinance to determine whether a taking has occurred, or whether there was a valid noncompensable regulatory action.
 
 (Duffy
 
 v.
 
 City of Long Beach
 
 (1988) 201 Cal.App.3d 1352, 1358-1359 [247 Cal.Rptr. 715];
 
 Guinnane
 
 v.
 
 City and County of San Francisco
 
 (1987) 197 Cal.App.3d 862 [241 Cal.Rptr. 787] cert. den. (1988) 488 U.S. 823 [102 L.Ed.2d 47, 109 S.Ct. 70];
 
 Pier Gherini
 
 v.
 
 California Coastal Com.
 
 (1988) 204 Cal.App.3d 699 [251 Cal.Rptr. 426];
 
 Zilber
 
 v.
 
 Town of Moraga
 
 (N.D.Cal. 1988) 692 F.Supp. 1195, 1205;
 
 Kinzli
 
 v.
 
 City of Santa Cruz
 
 (9th Cir. 1987) 830 F.2d 968 [order amending opn. at 818 F.2d 1449] cert. den. (1988) 484 U.S. 1043 [98 L.Ed.2d 861, 108 S.Ct. 775].)
 
 [22]
 

 Thus,
 
 First English
 
 focused solely on the constitutional remedy required once it has been determined that a “taking” has occurred. It did not discuss or reject the concept of amortization. It did not alter the test for determining the delicate balance between the proper use of the state’s police powers and the point at which a regulation goes too far and becomes a taking. “In every case in which a landowner seeks compensation for burdensome regulation of his or her property, the standard remains whether the regulations in issue have deprived the landowner of
 
 all use
 
 of the property. ‘When, as here, the claim is made that the regulation has significantly diminished the property value, the focus of the inquiry is on the uses of the property which remain.’ ”
 
 (Terminals Equipment Co.
 
 v.
 
 City and County of San Francisco
 
 (1990) 221 Cal.App.3d 234, 243 [270 Cal.Rptr. 329], quoting
 
 Guinnane
 
 v.
 
 City and County of San Francisco, supra,
 
 197 Cal.App.3d 862, 868.)
 
 [23]
 

 
 *836
 

 First English
 
 has been the subject of considerable attention and has been discussed in numerous federal and state cases. Defendants have not cited any cases which have addressed its effect on the allowance of reasonable amortization as an alternative to just compensation. The issue of whether the inclusion of an amortization period in a land-use ordinance automatically immunizes the ordinance from a takings challenge has been addressed by the Fourth Circuit, significantly without reference to
 
 First English.
 
 In
 
 Georgia Outdoor Advertising
 
 v.
 
 City of Waynesville
 
 (4th Cir. 1990) 900 F.2d 783, the appellate court reversed a district court decision which had concluded that an ordinance prohibiting off-premise advertising following a four-year amortization period was unconstitutional on its face because it effectuated a taking of property without just compensation. Citing
 
 First English,
 
 the district court had concluded that the city was constitutionally free to ban all billboards if the ordinance provided for compensation. Alternatively, the city could provide for a reasonable amortization period without cash compensation if the ordinance was reasonable and regulated but did not eliminate all off-premise signs.
 
 (Georgia Outdoor Advertising, Inc.
 
 v.
 
 City of Waynesville (Waynesville II)
 
 (W.D.N.C. 1988) 690 F.Supp. 452, 458.) In reversing, the Fourth Circuit held that there is no black-letter rule which immunizes a land-use ordinance from a takings challenge simply because it contains an amortization period. “[Ajmortization periods cannot be viewed in isolation. Instead, amortization provisions are only ‘one of the facts that the district court should consider in defining the character of the government action . . .’ ” as a valid regulation or a compensable taking.
 
 (Georgia Outdoor Advertising, supra,
 
 900 F.2d at pp. 786-787, citing
 
 Naegele Outdoor Advertising, Inc.
 
 v.
 
 City of Durham
 
 (4th Cir. 1988) 844 F.2d 172, 177.)
 
 [24]
 

 B.
 
 Aesthetic or Scenic Zoning Remains a Legitimate Subject of Land-use Regulation
 

 Contrary to the conclusion of the trial court, the high court’s decision in
 
 Nollan
 
 does not alter established law discussed above that aesthetic values are an appropriate subject of land-use regulations.
 

 Nollan
 
 involved an administrative regulation of the California Coastal Commission which conditioned the granting of a rebuilding permit on the transfer of a public easement between two public beaches across the owners’ beachfront property. The commission’s purpose for imposing this condition was that the owners’ new house would block the view of the ocean and contribute to the development of a “wall” of residential structures which would, in turn, create a psychological barrier to the public’s realization of
 
 *837
 
 their right of access to the coast.
 
 (Nollan
 
 v.
 
 California Coastal Com’n., supra,
 
 483 U.S. at p. 828 [97 L.Ed.2d at pp. 863-864].) The California Court of Appeal upheld the condition against a claimed violation of the takings clause. The United States Supreme Court reversed.
 

 The court recognized that a broad range of governmental purposes and regulations, including “scenic zoning,” have been held to constitute a legitimate state interest which may properly be the subject of a land-use regulation. (483 U.S. at p. 834 [97 L.Ed.2d at pp. 687-688], citing
 
 Agins
 
 v.
 
 Tiburon, supra,
 
 447 U.S. 255, 260 [65 L.Ed.2d 106, 111-112].) It expressly stated that it assumed that the Commission’s purpose was permissible. The court held that the constitutional propriety of the regulation disappeared due to the lack of nexus between the original purpose and the condition. Providing physical access to the beach via an easement utterly failed to “substantially” advance the state’s expressed purpose of protecting the public’s visual access to the beach and thereby to assist them in overcoming a “psychological barrier” to using it. (483 U.S. at pp. 837-838 [97 L.Ed.2d at pp. 689-690].)
 

 Under
 
 Nollan
 
 then, to survive a Fifth Amendment takings challenge, the interest sought to be advanced by any land-use ordinance or regulation, including those with legitimate aesthetic purposes, must be substantially advanced by the regulation enacted.
 

 C.
 
 Whether a Land Use Regulation Is So Onerous as to Become a Taking Is an Ad Hoc Factual Determination
 

 Unlike the situation in
 
 Nollan,
 
 TRPA’s ordinance substantially and directly advances its legitimate interest in maintaining the natural scenic quality of the Region. It therefore satisfies the first part of the test of a valid noncompensable land use regulation. Whether the ordinance deprives defendants of the “economically viable use of [their] property” and thereby constitutes a compensable taking cannot be resolved on the record before us.
 
 [25]
 
 As noted by the Fourth Circuit, recent cases of the Supreme Court “raise questions about the propriety of summary judgment of takings claims without a fully developed factual record.”
 
 (Naegele Outdoor Advertising, Inc.
 
 v.
 
 City of Durham, supra,
 
 844 F.2d at p. 175;
 
 Georgia Outdoor Advertising
 
 v.
 
 *838
 

 City of Waynesville, supra,
 
 900 F.2d at p. 786.) These decisions emphasize that the determination of whether a regulation amounts to a “taking requires ad hoc factual inquiries . . .”
 
 (Hodel
 
 v.
 
 Irving
 
 (1987) 481 U.S. 704, 705 [95 L.Ed.2d 668, 673,107 S.Ct. 2076, 2077]) “conducted with respect to specific property and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.”
 
 (Keystone Bituminous Coal Assn.
 
 v.
 
 DeBendictis, supra,
 
 480 U.S. 470, 495 [94 L.Ed.2d 472, 494-495, 107 S.Ct. 1232, 1247].)
 

 Three factors to be considered in determining whether an ordinance deprives an owner of the economically viable use of the appropriate unit of its property are (1) the “economic impact of the regulation on the claimant”; (2) the “extent to which the regulation has interfered with distinct investment backed expectations”; and (3) the “character of the governmental action.”
 
 (Penn Central Transp. Co.
 
 v.
 
 New York City
 
 (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646, 2659];
 
 Rossco Holdings, Inc.
 
 v.
 
 State of California
 
 (1989) 212 Cal.App.3d 642, 657, fn. 7 [260 Cal.Rptr. 736].)
 

 While the allowance of an amortization period does not establish the validity of the ordinance as a matter of law,
 
 Naegele
 
 found it to be one of the relevant facts which should be considered in defining the character of the governmental action. Other facts to be considered include the number of billboards that can economically be used for noncommercial advertising, the number that are economically useless, the terms of the leases for billboard locations, the land defendants own for locations and whether it has any other economic use, the cost of billboards that cannot be used, the depreciation taken on these billboards and their actual life expectancy, the income expected during the grace period, the salvage value of billboards that cannot be used, the percentage of affected signs compared to the remaining signs in defendants’ business unit, the relative value of affected and remaining signs, whether the amortization period is reasonable, and any other evidence presented by the parties that the court deems relevant.
 
 (Naegele, supra,
 
 844 F.2d at p. 178.) These factors, as well as the 10 years in excess of the amortization period which defendants have had to recoup their investment, should be considered on remand. “It is only after a detailed factual examination, . . . that a court in the ordinary case properly should ascertain whether a regulation effects a taking.”
 
 (Georgia Outdoor Advertising, supra,
 
 900 F.2d at p. 789.) Such a detailed factual development and analysis must be conducted on remand before a determination can be made whether Ordinance No. 24 effects a taking or is a legitimate land-use regulation.
 

 
 *839
 
 IV
 

 Constitutionality of Ordinance No. 24
 

 Claiming that TRPA’s ordinance is identical to the San Diego ordinance invalidated in
 
 Metromedia Inc.
 
 v.
 
 City of San Diego, supra,
 
 453 U.S. 490, defendants argue that TRPA’s sign ordinance is unconstitutional on its face in violation of the free speech clause of the First and Fourteenth Amendments to the United States Constitution. We conclude that the ordinance is facially invalid due to its exception for political signs. We further conclude, however, that the prohibition of the ordinance is limited to off-premise commercial signs and can be construed constitutionally by severing this exception. As construed, the ordinance does not selectively permit certain types of noncommercial speech to the exclusion of others.
 
 [26]
 

 The San Diego sign ordinance at issue in
 
 Metromedia
 
 permitted on-site commercial advertising, but other commercial advertising and all noncommercial communications using fixed structure signs were forbidden everywhere unless they fell within one of twelve specific categories.
 
 [27]
 
 While generally of a commercial nature, the billboards in San Diego had also been used to convey a broad range of noncommercial political and social messages. It was stipulated that the effect of the ordinance was to eliminate the outdoor advertising business in San Diego.
 

 “Section B, the crucial prohibitory language of the ordinance, bans all outdoor advertising display signs except for signs identifying the premises where the sign is located or advertising a product or service sold on those premises. The ordinance thus impartially bans commercial or noncommercial off-site signs, but while it permits an owner or lessee to erect a sign to advertise his business, it does not permit him to erect a sign to state his political or social views. Section F of the ordinance then provides 12 specific and narrow exceptions, of which the most important excepts political campaign signs maintained for no longer than 90 days. Many of the exceptions relate to noncommercial signs, but even taking into account all the exceptions the ordinance still appears to enact a substantial prohibition on
 
 *840
 
 noncommercial signs.”
 
 (Metromedia, Inc.
 
 v.
 
 City of San Diego
 
 (1982) 32 Cal.3d 180, 183 [164 Cal.Rptr. 510, 610 P.2d 407]
 
 (Metromedia II
 
 on remand).)
 

 The purpose of San Diego’s ordinance was to eliminate traffic hazards caused by distracting signs and to improve the city’s appearance. It sought to accomplish this goal by prohibiting all off-site “outdoor advertising display signs.” The ordinance did not define this term. The California Supreme Court supplied the following definition from section 18090.2 of the Revenue and Taxation Code: an “outdoor advertising display sign” is “ ‘a rigidly assembled sign, display, or device permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting or used for the display of, a commercial or other advertisement to the public.’ ”
 
 (Metromedia Inc.
 
 v.
 
 City of San Diego, supra,
 
 26 Cal.3d at p. 856, fn. 2.) Believing that this definition would avoid constitutional issues raised by a more expansive definition, the court held, inter alia, that the ordinance was not a violation of the First Amendment.
 
 (Id.
 
 at pp. 866-867.)
 

 In a plurality opinion, the United States Supreme Court reversed.
 
 (Metromedia Inc.
 
 v.
 
 City of San Diego, supra,
 
 453 U.S. 490 (White, J., for himself and Stewart, Marshall and Powell, JJ.; Brennan and Blackmun, JJ., cone.).) The court found that the San Diego ordinance was constitutional insofar as it regulated commercial speech and that a distinction may legitimately be drawn prohibiting ofi-site commercial billboards while permitting on-site commercial billboards.
 
 (Id.
 
 at p. 512 [69 L.Ed.2d at pp. 817-818].)
 

 As to noncommercial speech, however, the court held that the ordinance may not give greater value to the communication of commercial messages over noncommercial messages. Such a preference is constitutionally flawed because it inverts the established notion of according greater protection to noncommercial speech. The fatal flaw of San Diego’s ordinance in this regard was permitting all on-site commercial signs while prohibiting all on-site noncommercial signs except those which fell within one of the limited exceptions. (453 U.S. at p. 512 [69 L.Ed.2d at 817-818].)
 

 In addition, whether on-site or off-site, the court held that the ordinance was flawed by permitting only certain types of noncommercial messages. “Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests. [Citations.] With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse.” (453 U.S. at pp. 514-515 [69 L.Ed.2d at
 
 *841
 
 p. 819].) For these reasons, the court held that the ordinance was unconstitutional on its face.
 
 (Id.
 
 at 521 [69 L.Ed.2d at p. 823].)
 

 Metromedia
 
 thus establishes that a governing entity “may permit onsite signs while restricting offsite signs. The only restrictions are that noncommercial messages must be permitted in locations where commercial messages are permitted, and the local entity cannot regulate what type of noncommercial message ... is permissible; in other words a government entity must be neutral in its regulation of noncommercial speech.”
 
 (City of Salinas
 
 v.
 
 Ryan Outdoor Advertising, Inc., supra,
 
 189 Cal.App.3d at p. 432.)
 

 A.
 
 Preference for On-premise Commercial Speech
 

 Focusing on the “commercial” definition of “on-premise sign,” defendants argue that TRPA’s ordinance limits the signs an owner can display on his property to those containing commercial messages and thus creates an unlawful preference for commercial speech under
 
 Metromedia.
 
 This interpretation conflicts with the language of the ordinance. Section 3.00 of TRPA Ordinance No. 24 broadly defines “sign” to encompass those containing both commercial and noncommercial messages, but does not prohibit “signs” themselves. The definition of “on-premise” signs does indeed encompass only commercial messages, but there is nothing in the ordinance which affirmatively prohibits an owner from displaying a noncommercial message on his property. The intent and purpose of the ordinance is reflected in its title, “An Ordinance Prohibiting Off-Premise Signs Within the Tahoe Region.” The key section of TRPA’s ordinance is section 4.10 which prohibits “all off-premise signs” within the Region, except as provided in section 9.00, the “political signs” exception. The only regulation placed on “on-premise” signs is contained in section 4.30’s height limitation. By contrast, the prohibitory section of San Diego’s ordinance expressly excluded only commercial on-site signs.
 

 That TRPA Ordinance No. 24 does not prohibit noncommercial on-site messages is bolstered by section 4.20’s prohibition of attachment of “signs” to any tree or natural vegetation within the Region. The application of this section to the broader universe of “signs” presupposes the existence of noncommercial signs on owner-occupied property to which its prohibition would apply. Under defendants’ interpretation, there would simply be no purpose for including a more expansive definition of “signs.”
 

 TRPA’s ordinance thus does not commit the fatal error found in
 
 Metromedia
 
 of according greater preference to on-site commercial signs than to on-site noncommercial signs.
 

 
 *842
 

 B. Regulation of Noncommercial Speech
 

 Defendants argue that by permitting certain types of noncommercial speech while prohibiting others, TRPA Ordinance No. 24 is unconstitutional under
 
 Metromedia.
 
 In particular, they point to the exception for temporary political signs under section 9.00
 
 [28]
 
 and the exclusion of certain flags, crests and scoreboards from the scope of the term “sign” as defined by section 3.00.
 

 TRPA Ordinance No. 24 does not prohibit all “signs.” Its crucial prohibitory language is contained in section 4.10 which provides that “(e)xcept as otherwise provided in section 9.00, all off-premise signs are prohibited within the Region.” On its face, the ordinance permits one type of off-premise noncommercial sign based on its content. The existence of this exemption implies that political signs maintained for longer than 21 days or which do not pertain to a particular election are prohibited by the ordinance. “The First Amendment’s hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.”
 
 (Consolidated Edison
 
 v.
 
 Public Serv. Comm’n.
 
 (1980) 447 U.S. 530, 537 [65 L.Ed.2d 319, 328, 100 S.Ct. 2326].) Defendants’ point is well taken that, under
 
 Metromedia,
 
 an exception for one type of noncommercial speech such as temporary political signs and not for all others is unconstitutional. TRPA cannot choose the subjects for permissible public debate under the guise of regulating the proliferation of billboards in the scenic Tahoe Basin.
 

 This conclusion does not mean that TRPA’s ordinance cannot be upheld as valid. “It is the duty of the courts, wherever possible, to construe a statute in a manner which is reasonable, consistent with the statutory purpose, and eliminates doubts as to its constitutionality. [Citations.] In examining the legislation for such a construction, the court should seek an interpretation which preserves as much of the constitutional provisions of the statute as possible, but which the legislative body would have intended to put into effect had it foreseen the constitutional limitations.”
 
 (City and County of San Francisco
 
 v.
 
 Eller Outdoor Advertising
 
 (1987) 192 Cal.App.3d 643, 663 [237 Cal.Rptr. 815].)
 

 
 *843
 
 In
 
 Metromedia,
 
 San Diego’s ordinance banned all noncommercial messages, whether on- or off-premises, with the exception of 12 categories permitted under section F. After determining that the ordinance was unconstitutional on its face, the court noted that “[s]ince our judgment is based essentially on the inclusion of noncommercial speech within the prohibitions of the ordinance, the California courts may sustain the ordinance by limiting its reach to commercial speech, assuming that the ordinance is susceptible to this treatment.”
 
 (Metromedia, supra,
 
 453 U.S. at p. 521, fn. 26 [69 L.Ed.2d at p. 824],)
 
 [29]
 
 Unlike San Diego’s ordinance, TRPA’s ordinance is susceptible to this treatment.
 

 We first consider whether the ordinance’s off-premise prohibition is aimed at both commercial and noncommercial messages or if can be construed to apply solely to commercial speech. The “[j]udicial doctrine governing construction of a law to avoid unconstitutionality is well settled. If ‘the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution’.
 
 (County of Los Angeles
 
 v.
 
 Legg
 
 (1936) 5 Cal.2d 349, 353 . . . .) Consequently, ‘[i]f feasible within bounds set by their words and purposes, statutes should be construed to preserve their constitutionality.’
 
 (Conservatorship of Hofferber
 
 (1980) 28 Cal.3d 161, 175 . . . .)”
 
 (Metromedia II, supra,
 
 32 Cal.3d at p. 186, citations omitted.) In its effort to save a statute through judicial construction, however, the court cannot rewrite the statute, because this is essentially a legislative function.
 
 (Id.
 
 at p. 187.)
 

 “Off-premise” signs under TRPA’s ordinance are defined as those “advertising or otherwise relating to any business, product or activity not being conducted or produced on the lot or parcel on which the sign is located, . . .” (TRPA Ord. No. 24, § 3.00.) Unlike the definition of “on-premise” sign, the term “business” does not modify the term “activity” in the off-premise definition.
 
 [30]
 
 The bare term “activity” has been recognized to connote both commercial and noncommercial activity.
 
 (Metromedia II, supra,
 
 32 Cal.3d at p. 186.)
 

 
 *844
 
 “Our primary task in construing any law is to ascertain the legislative intent.” (32 Cal.3d at p. 187.) In accordance with TRPA’s legislative intent and its enforcement history, the term “activity” as used in the definition of “off-premise” sign may reasonably be construed as limited to “commercial activity.” The surrounding language lends support to this interpretation. Signs “advertising a business or activity being conducted within an integrated commercial complex and located on property within that commercial complex” are excepted from the definition of off-premise signs. The exclusion of activities occurring in an “integrated commercial complex” from the off-premise definition supports the conclusion that the “activity” referred to in the definition itself is commercial activity.
 
 [31]
 
 More importantly, TRPA has never interpreted its ordinance to apply to noncommercial speech. As indicated in the joint stipulation of facts, “the vast majority of the off-premises signs in existence when TRPA Ordinance No. 24 was adopted were signs displaying messages related solely to economic interest of the persons, firms, organizations or corporations advertised thereon and that TRPA Ordinance No. 24 has only been enforced to remove or enjoin the use of signs displaying messages related solely to economic interests of the [use of signs displaying interests of the] person, firms or corporations advertised thereon.”
 
 [32]
 
 TRPA’s intent to regulate only off-premise commercial advertising via its ordinance is also reflected in its variance provision, which permits continuation of existing off-premise signs to provide directions to the “business, location or commodity advertised,” where “the lack of such sign will deprive the business, location or commodity advertised of privileges enjoyed by other similarly situated businesses, locations or commodities. . . .” (TRPA Ord. No. 24, § 8.00) Thus, limitation of the ordinance to commercial activity does no more than formalize TRPA’s original intent and its current practice.
 

 As construed, TRPA’s ordinance, which prohibits only off-premise commercial signs, can be sustained by severing the exception for temporary political signs because “severance is mechanically feasible and the legislative body would have preferred such an outcome to total invalidation.”
 
 (Metromedia, II, supra,
 
 32 Cal.3d at p. 189.) It is clear that TRPA would
 
 *845
 
 prefer limitation of its ordinance over its total invalidation. (TRPA Ord. No. 24, § 2.20.)
 
 [33]
 
 Severance, authorized by section 2.20 of the ordinance, is mechanically feasible. It can be accomplished by striking the exclusionary clause of section 4.10 (“Except as otherwise provided in section 9.00”) and by eliminating section 9.00. Thus narrowed, the prohibition of the ordinance applies exclusively to all off-premise signs which by definition are of a commercial nature. It does not unconstitutionally grant preference to certain noncommercial signs based on their content.
 

 V.
 

 Disposition
 

 The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. Costs to TRPA.
 

 Sparks, Acting P. J., and Sims, J., concurred.
 

 A petition for a rehearing was denied October 4, 1991, and respondents’ petition for review by the Supreme Court was denied November 21, 1991.
 

 [1]
 

 A summary judgment is proper only if there is no triable issue of fact and, as a matter of law, the moving party is entitled to judgment. (Code Civ. Proc., § 437c.) The fact that both parties moved for summary judgment does not conclusively establish the absence of a triable issue of fact; the trial court must independently determine the motions.
 
 (Coast Elevator Co.
 
 v.
 
 State Bd. of Equalization
 
 (1975) 44 Cal.App.3d 576, 583-584 [118 Cal.Rptr. 818], overruled on another point in
 
 Culligan Water Conditioning
 
 v.
 
 State Bd. of Equalization
 
 (1976) 17 Cal.3d 86, 93, fn. 4 [130 Cal.Rptr. 321, 550 P.2d 593].)
 

 Both parties failed to provide the separate statement of undisputed facts as required by Code of Civil Procedure section 437c. The court concluded that these statements were unnecessary because of the joint statement of stipulated facts which it adopted as its findings of fact, and it exercised its discretion under section 437c, subdivision (b) not to deny the motions on that ground. No supporting or opposing affidavits were filed.
 

 [2]
 

 Section 5.00 of TRPA’s ordinance, “Nonconforming and Unauthorized Signs," provides for the amortization and removal of nonconforming signs “at such time as their original cost is fully amortized for tax purposes within five (5) years of the date this ordinance becomes effective” or within certain shorter limitations based upon the value of the sign, whichever is sooner. (Ord. No. 24, subd. 5.10.) It also provides that the “value of the sign shall be based on its original cost less depreciation to such time as its value is being assessed.” (Ord. No. 24, subd. 5.60.) The maximum five-year amortization period ended in September 1980.
 

 [3]
 

 All further undesignated statutory code references are to the Government Code, Tahoe Regional Planning Compact, sections 66800, 66801.
 

 [4]
 

 In legal actions which challenge a legislative act or decision of TRPA, such as the enactment of ordinances implementing the regional plan, “the scope of the judicial inquiry shall extend only to the questions of whether the act or decision has been arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law.” (§ 66801, art. VI, subd. (j)(5).) Article X provides that “the provisions of this compact shall be reasonably and liberally construed to effectuate [its] purposes. . . .”
 

 [5]
 

 “Effective control” means that only five categories of signs are permitted within this area: directional and official signs and notices relating to natural wonders, and scenic and historical attractions; signs advertising the sale of lease of the property on which they are located; signs advertising activities conducted on the premises; landmark signs lawfully in existence on October 22, 1965; and signs for the distribution of free coffee to travelers by nonprofit organizations. (23 U.S.C. § 131(c).) An exception is provided to allow outdoor advertising
 
 *817
 
 consistent with customary use within those portions of the affected area which are industrial or commercial. (23 U.S.C. § 131(d).)
 

 [6]
 

 Pursuant to the act, the federal government pays 75 percent of the compensation for both the taking of the sign and for the taking of the real property on which the sign is located. (23 U.S.C. § 131(g).) If federal funds are not available to make this compensation payment, no signs can be required to be removed. (23 U.S.C. § 131(n).)
 

 [7]
 

 Lake County Estates
 
 does not contradict
 
 Cuyler’s
 
 rule that congressional consent transforms an interstate compact into a law of the United States. The court’s rationale for finding state action was based on the states’ power to act after congressional approval by each state appointing its allotted members to the agency and securing financing, and their power to confer additional powers and duties on the agency without further congressional action.
 
 (NYSA-ILA Vac. & Holiday Fund
 
 v.
 
 Waterfront Com’n
 
 (2d Cir. 1984) 732 F.2d 292, 296-297, fn. 9.)
 

 [8]
 

 Title 28 United States Code section 1331 (formerly § 1331(a)), as amended October 21, 1976, Pub.L. No. 94-574, provides that “[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.”
 

 [9]
 

 Following
 
 B.J.K. Corp.,
 
 various courts have determined that the interpretation of TRPA ordinances is a question of federal law
 
 (League to Save Lake Tahoe
 
 v.
 
 Crystal Enterprises
 
 (9 th Cir. 1982) 685 F.2d 1142, 1144) and subject to federal question jurisdiction
 
 (California Tahoe Regional Planning Agcy.
 
 v.
 
 Jennings, supra,
 
 594 F.2d at p. 187;
 
 People, etc.
 
 v.
 
 City of South Lake Tahoe, supra, 466
 
 F. Supp
 
 527; Cal. Tahoe Regional Planning
 
 v.
 
 Harrah’s Corp.
 
 (1981) 509 F. Supp. 753, 755;
 
 Cal. Tahoe Regional Planning
 
 v.
 
 Sahara Tahoe Corp.
 
 (D.Nev. 1980) 504 F.Supp. 753, 755.)
 

 [10]
 

 Under the well-pleaded complaint rule, whether a case arises under federal law must be determined from the allegations of plaintiff’s complaint, without anticipating potential federal defenses or federal defenses to defenses. (463 U.S. at p. 10 [77 L.Ed.2d at p. 431].)
 

 [11]
 

 Achieving federal question jurisdiction does not guarantee success on the merits of a statutorily based preemption claim.
 
 (New Orleans Public Service
 
 v.
 
 City of New Orleans
 
 (5th Cir. 1986) 782 F.2d 1236, 1242.)
 

 [12]
 

 Following
 
 Markham,
 
 the district court in
 
 Sullivan Outdoor Advertising
 
 v.
 
 Dept. of
 
 Transp. (N.D.Ill. 1976) 420 F.Supp. 815, rejected advertisers’ contention that an Illinois statute, which provided for the taking of signs without compensation, conflicted with the HBA’s just compensation provisions and was void under the supremacy clause. Because this issue was one of those appealed to the Supreme Court in
 
 Markham
 
 and dismissed for want of a substantial federal question, “[t]his action clearly constituted a
 
 decision on
 
 the merits of the plaintiff’s claim in
 
 Markham,
 
 and we are not free to disregard it here. [Citations.]”
 
 (Id.
 
 at p. 819.)
 

 [13]
 

 The lack of such powers would not, of course, be a defense to an inverse condemnation action should the ordinance at issue subsequently be determined to constitute a “taking.”
 
 (Tahoe-Sierra Preserv., Inc.
 
 v.
 
 Tahoe Reg. Planning Agency
 
 (9th Cir. 1990) 911 F.2d 1331, 1341; cert. den. (1991) _ U.S. _ [113 L.Ed.2d 459, 111 S.Ct. 1404].) As discussed in part III(C),
 
 post,
 
 whether the ordinance in fact constitutes a taking must be determined on remand after consideration of various factors, including the extent to which the regulation has interfered with the owner’s distinct investment backed expectations.
 

 [14]
 

 As noted in
 
 De Veau
 
 v.
 
 Braisted
 
 (1960) 363 U.S. 144, 154, [4 L.Ed.2d 1109, 1117, 80 S.Ct. 1146], “it is of great significance that in approving the compact Congress did not merely remain silent regarding supplementary legislation by the States. Congress expressly gave its consent to such implementing legislation not formally part of the compact. This provision in the consent by Congress to a compact is so extraordinary as to be unique in the history of compacts. Of all the instances of congressional approval of state compacts—the process began in 1791, Act of Feb. 4, 1791, 1 Stat. 189, with more than one hundred compacts approved since—we have found no other in which Congress expressly gave its consent to implementing legislation.”
 

 For the first time at oral argument, advertisers assert that the fact that TRPA can request money from various local and state governmental entities implies that Congress intended TRPA to be subject to the compensation provisions of the HBA. (See Compact, art. VIII; § 66801, art III.) Issues raised for the first time in oral argument will not be considered by the appellate court.
 
 (Lotts
 
 v.
 
 Board of Park Commrs.
 
 (1936) 13 Cal.App.2d 625, 636 [57 P.2d 215].) In any event, we do not share their conclusion that it is reasonable to believe that Congress intended this convoluted financing method—which is subject to the whim of the governmental entities involved—to function as a method of enforcing a key provision of the TRPA, reducing scenic blight. On the contrary, pursuant to our analysis, Congress’s decision not to give TRPA powers of eminent domain demonstrates its clear intention to create an implied exception to the HBA within the Region and to allow the removal of nonconforming billboards pursuant to TRPA’s police powers.
 

 [15]
 

 A review of the enforcement process under the HBA as described in
 
 Larson, supra,
 
 underscores its discretionary nature: “Pursuant to the HBA, each state that participates in its highway beautification program is responsible for enforcing the requirements of the Act by exercising ‘effective control’ over outdoor advertising. The requirements are defined by the Act, federal regulations and an agreement entered into between the state and the Secretary of Transportation (Secretary). It is up to the Secretary, acting through the FHWA [Federal Highway Administration], to monitor compliance. [23 C.F.R. Section 1.37 (1983); 49 C.F.R. Section 1.48(b)(21), (c)(ll)(1982).] If the Secretary determines, based on recommendations from the FHWA Administrator, that a state is not maintaining ‘effective control,’ she may institute formal enforcement proceedings and ultimately withhold 10 [percent] of the federal highway funds until compliance is achieved. (23 U.S.C. § 131(b).) However, if the Secretary determines it to be ‘in the public interest’ she may suspend the withholding of funds. (23 U.S.C. § 131(b).) The withholding decisions and the decision to commence enforcement proceedings are reserved exclusively to the Secretary, but the FHWA initially seeks compliance through less formal means. (49 C.F.R. § 1.44( j) (1982).)” (882 F.2d at p. 129.)
 

 [16]
 

 The congressional consent to both the 1969 Compact and the 1980 Compact contains the following qualification: “Nothing contained in this Act or in the compact consented to shall in any way affect the powers, rights, or obligations of the United States, or the applicability of any law or regulation of the United States in, over or to the region or waters which are the subject of the compact, or in any way affect rights owned or held by or for Indians or Indian tribes subject to the jurisdiction of the United States.” (Pub.L. No. 91-148, 83 Stat. 360, 369, art. VIII, § 5, 1969 Compact; Pub.L. No. 96-551, 94 Stat. 3233, 3255, art. X, § 5, 1980 Compact).
 

 [17]
 

 In
 
 De Veau,
 
 the court upheld section 8 of New York’s Waterfront Commission Act against claims of preemption by sections 7 and 8 of the National Labor Relations Act (NLRA) and section 504(a) of the Labor-Management Reporting and Disclosure Act (LMRDA) of 1959. Section 8 of the waterfront act was implementing state legislation enacted pursuant to a congressionally approved compact which made it unlawful for a convicted felon who had not been pardoned or received a good conduct certificate to collect or receive any union dues. NLRA sections 7 and 8 protect workers’ rights to organize and to choose and bargain through their own representatives, presumably including felons. Section 504a of LMRDA restricted union officers to exclude those who had been convicted of felonies or had been imprisoned within the preceding five years. As pointed out by the dissent, article XV, section 1 of the Compact as approved by Congress specifically provided that “[t]his compact is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way, individually, collectively, and through labor organizations or other representatives of their own choosing. Without limiting the generality of the foregoing, nothing contained in this compact shall be construed to limit in any way the right of employees to strike.” (N. J. & N. Y.—Waterfront Com. Compact, ch. 407, P.L. 252, Act of Aug. 12, 1953, U.S. Code Cong, and Admin. News, 83d Congress, First Sess. pp. 605, 623.) The existence of this clause did not hamper the majority’s conclusion that there was no preemption.
 

 [18]
 

 The Compact (§ 66801) mentions the following state laws: open meeting laws applicable to meetings of TRPA’s governing board (art. Ill, subd. (d)); public record laws, applicable to TRPA plans, ordinances or records (art. Ill, subd. (i)); and civil service laws, applicable to TRPA’s personnel standards and regulations “insofar as possible” (art. IV, subd. (b)). Laws of Nevada regarding restricted gaming licenses are also made expressly applicable within the Region (art. II, subd. (g)).
 

 [19]
 

 Metromedia, supra,
 
 26 Cal.3d at page 865, footnote 12, overruled
 
 Varney & Green
 
 v.
 
 Williams
 
 (1909) 155 Cal. 318 [100 P. 867] which held that aesthetic purposes alone cannot justify assertion of the police power to ban billboards. As noted by the United States Supreme Court in its decision reversing Metromedia on other grounds, this brought California’s position on the exercise of police power on purely aesthetic grounds into “accord with that of most other jurisdictions.”
 
 (Metromedia, Inc.
 
 v.
 
 San Diego, supra,
 
 453 U.S. at p. 508, fn. 13 [69 L.Ed.2d at p. 815].)
 

 [20]
 

 Procedurally, the trial court in
 
 First English
 
 had granted a motion to strike plaintiff’s allegation that the ordinance denied it “all use” of its property as irrelevant under
 
 Agins.
 
 The Court of Appeal affirmed the decision to strike this allegation and assumed that the complaint
 
 *834
 
 sought damages for an uncompensated taking of all use. It then rejected the cause of action under
 
 Agins.
 
 The United States Supreme Court noted that this “isolates the remedial question for our consideration.”
 
 (First English, supra,
 
 482 U.S. at p. 311 [96 L.Ed.2d at p. 261].)
 

 [21]
 

 The only prohibition under the ordinance was the reconstruction of the demolished or damaged structures or construction of new structures. Occupancy and use of surviving structures were permitted, as well as various camping activities. The court noted that plaintiff’s property is located in an area zoned “R-R” (Resort and Recreation); that the ordinance by its terms temporarily prohibited building only within a specified area which would implicate only 13 of plaintiff’s 21 acres. During the period of the interim ordinance and after the enactment of the permanent ordinance, the property could be used for both
 
 *835
 
 “agricultural and recreational uses.” Accordingly, the court found the ordinance to be a valid exercise of the police power and not an unconstitutional taking.
 
 (First English II, supra,
 
 210 Cal.App.3d at pp. 1363-1374.)
 

 [22]
 

 In
 
 Guinnane, supra,
 
 197 Cal.App.3d at page 868, the court noted that “there is nothing in
 
 First English
 
 which changes the rule that a ‘taking’ must occur before compensation may be claimed.” The court determined that a city’s interim delay in taking action on a building permit application did not constitute a compensable temporary taking under a
 
 First English
 
 theory where plaintiff was not denied all use of his property because plaintiff “was neither deprived of his right to exclude others from his land nor denied the right to sell the property.” In
 
 Kinzli, supra,
 
 830 F.2d 968, the court stated that
 
 First English
 
 “explicitly distinguished cases such as this one in which ‘the factual disputes yet to be resolved by state authorities might still lead to the conclusion that no taking had occurred . . . .’ (107 S.Ct. at p. 2383).”
 

 [23]
 

 First English II, supra,
 
 210 Cal.App.3d at pages 1365-1367, noted a difference between the
 
 Agins
 
 formulation (deprivation of economically viable use) and the
 
 First English
 
 formulation (all uses) of the test and opined that perhaps it was due to the higher purpose—the preservation of lives and health—involved in
 
 First English.
 
 It suggested a flexible approach of denying compensation where “all uses" of property are involved if health and safety are at stake but requiring compensation for the denial of “all uses” in cases of land use regulations which advance lesser public purposes.
 
 (Id.,
 
 at p. 1366.) It did not choose between these formulations however because it found that, under either, the ordinance did not deprive
 
 First English
 
 of all use of its property and those uses it did deny could be constitutionally prohibited under the county’s power to protect public safety.
 

 [24]
 

 The court had previously concluded that the ordinance was a valid exercise of the city’s police power, even if its sole purpose was aesthetics.
 
 (Georgia Outdoor Advertising
 
 v.
 
 City of Waynesville
 
 (4th Cir. 1987) 833 F.2d 43.)
 

 [25]
 

 The joint stipulation of facts does not provide a sufficient factual basis to determine whether TRPA’s ordinance constitutes a taking. It does not provide a factual basis for the court’s determination that the “outright use of the signs where now located is forbidden,” that the sign owner has only the right to remove it to some unprohibited location outside the Tahoe Basin or that the property owner is “left only with bare land no longer producing any income.” There is no indication of whether the billboards may be used for legitimate on-premise advertising in the Region, of the nature and use of the land on which the signs are located, or any of the other relevant factors listed in
 
 Naegele Outdoor Advertising, Inc.
 
 v.
 
 City of Durham, supra,
 
 844 F.2d 172.
 

 [26]
 

 By granting defendants’ motion for summary judgment, the trial court had no need to, nor did it, address this issue. Because we find their motion to have been erroneously granted, the issue is now squarely before us.
 

 [27]
 

 Exempted categories included government signs; signs at public bus stops; signs manufactured, transported or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs in shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature and news; approved temporary, off-premises subdivision directional signs; and temporary political signs.
 

 [28]
 

 Section 3.00 defines “political sign” as one “advertising a candidate for public office, proposition, or other issue to be voted on by the electorate.” Section 9.00 provides that such signs are permitted subject to its requirements that (1) no sign shall be placed on “any premises” without the consent of the owner/occupant; (2) no sign shall be placed more than 21 days prior to the election to which it relates; (3) all signs must be removed within 7 days after the election to which it relates except that a successful primary candidate may maintain the sign until 7 days after a general election held within 60 days of the primary; and (4) the signs shall not exceed 12 square feet.
 

 [29]
 

 On remand, the California Supreme Court determined that San Diego’s ordinance was not susceptible to this treatment because the ordinance manifested a direct intent to impose a comprehensive ban on practically all noncommercial signs. The court noted that it was “clear that the San Diego City Council, in enacting the ordinance in question, intended to include noncommercial billboards” and that this construction would be contrary to the legislative intent.
 
 (Metromedia II,
 
 supra, 32 Cal.3d at p. 189.)
 

 [30]
 

 The phrase “business, product or activity” in the off-premise definition may be contrasted with the phrase “business product or activity” used in the definition of “on-premise” signs. (§ 3.00.) Whether by design or accident, the inclusion of a comma between “business” and “product” in the “off-premise” definition removes “business” as a modifier of the term “activity.”
 

 [31]
 

 The two remaining exceptions from the “off-premise” definition are (1) “signs erected or authorized by the state or local government for the purpose of public safety or information (e.g., traffic signs, hospital directional signs)” and, (2) “signs indicating that the property on which said sign is located is for rent, lease or sale.” (TRPA Ord. No. 24, § 3.00) The first of these categories is comprised of legitimate, content-neutral exceptions.
 
 (City and County of San Francisco
 
 v.
 
 Eller Outdoor Advertising, supra,
 
 192 Cal.App.3d at p. 665, fn. 15.) The second is clearly commercial.
 

 [32]
 

 Defendants did not stipulate to this but acknowledged that TRPA would present evidence to this effect. The trial court found that defendants’ admission of the existence of evidence in support of this offering justified a finding that the facts were true for the purposes of these motions.
 

 [33]
 

 Section 2.20 provides that the “provisions of this ordinance shall be liberally construed to effectuate their purposes. If any section, clause, provision, or portion of this ordinance is adjudged unconstitutional or invalid by a court of competent jurisdiction, the remainder of this ordinance shall not be affected thereby.”